# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| AARON M. BIBLER, | CASE NO. 3:24-CV-01764 |
| Plaintiff, | |
| vs. | JUDGE JAMES R. KNEPP II |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Aaron M. Bibler ("Plaintiff" or "Mr. Bibler") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.     Procedural History

Mr. Bibler filed his DIB application on September 30, 2021, and filed his SSI application on October 15, 2021, alleging disability beginning June 19, 2020. (Tr. 17, 60-61.) He subsequently amended his alleged onset date to May 31, 2021. (Tr. 17, 37-38) He alleged disability due to: bulging disc in spine; ligament and meniscus problems in right knee; arthritis whole body; degenerative disc disease; and sciatica. (Tr. 62, 74, 101, 134, 267.) His

1

applications were denied at the initial level (Tr. 97-106, 119-126, 131-38) and upon reconsideration (Tr. 136-44).  He then requested a hearing.  (Tr. 139-44.)

On March 4, 2024, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 17, 34-59.)  The ALJ issued an unfavorable decision on June 14, 2024, finding Mr. Bibler had not been under a disability from May 31, 2021, through the date of the decision.  (Tr. 14-33.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 206-07.)  The Appeals Council denied his request for review on August 21, 2024, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Plaintiff filed the pending appeal on October 10, 2024 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 8, 10, 11).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Bibler was born in 1971.  (Tr. 25, 39, 225.)  He was 50 years old on the amended disability onset date.  (Tr. 25.)  He was 52 years old and homeless at the time of the hearing.  (Tr. 39-40.)  He has a high school education and vocational training in the flooring industry.  (Tr. 26, 41, 268.)  He was self-employed, installing flooring, and previously worked in factories.  (Tr. 25, 42-47, 268.)  He last worked in 2019 or 2020.  (Tr. 42, 267-68.)  He stopped working due to his health conditions and because his job closed during the pandemic.  (Tr. 42, 267.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

On September 20, 2022, Mr. Bibler presented to Relindis M. Akwanga, CNP at Presbyterian Medical Services to establish care.  (Tr. 381-87.)  He complained of musculoskeletal pain and requested imaging for his disability application.  (Tr. 381.)  He said he was homeless because he could not work due to back pain.  (*Id*.)  He reported a history of drug

2

use and said he quit about ten months prior.  (*Id*.)  He also reported chronic pain for twenty years.  (*Id*.)  He was not taking any medication but said he tried everything, including pain management and physical therapy, with no relief.  (*Id*.)  His pain was located in his right knee, right shoulder, and low back, and he described his pain level as moderate.  (*Id*.)  He reported a bulging disc in his lower back and a torn meniscus with no ACL in the right knee, saying he needed knee replacement surgery.  (*Id*.)  His back pain radiated to his left leg with numbness and tingling, and was aggravated by movement, walking, and activities of daily living.  (*Id*.)  He reported feeling down, depressed, or hopeless several days in the prior two weeks.  (Tr. 382.)  On examination, he appeared older than his stated age, disheveled, and anxious.  (Tr. 384.)  He walked with a limp and exhibited tenderness and mild pain with range of motion in the lumbar spine, right shoulder, and right knee; his musculoskeletal range of motion was otherwise normal. (*Id*.)  He denied anxiety, but appeared anxious and agitated.  (*Id*.)  Mr. Bibler was diagnosed with chronic bilateral low back pain with left-sided sciatica, chronic right shoulder pain, chronic right knee pain, and substance abuse disorder.  (Tr. 385-86.)  He said he did not want NSAIDs or physical therapy, and that he was not interested in returning to pain management because he felt it would hot help.[1]  (Tr. 385.)  He only wanted imaging for his disability applications as requested by his counsel.  (*Id*.)  CNP Akwanga advised Mr. Bibler to rest and apply heat and ice as needed and ordered x-rays of the lumbar spine, right shoulder, and right knee.  (*Id*.)  Mr. Bibler was upset that x-rays were ordered, rather than MRIs.  (*Id*.)  CNP Akwanga advised him that an MRI would be ordered if the x-rays showed anything that warranted an MRI.  (*Id*.)

On October 13, 2022, Mr. Bibler returned to CNP Akwanga.  (Tr. 388-94.)  He continued to report musculoskeletal pain located in his back and right knee, which he rated as moderate.

---

[1] He also declined a referral to behavioral health.  (Tr. 386.)

(Tr. 388.)  His pain was aggravated by movement and walking, and he reported no relieving factors.  (*Id*.)  CNP Akwanga noted that Mr. Bibler's lumbar x-ray showed lumbar spondylosis and disc space narrowing, while the right knee x-ray showed osteoarthrosis and suprapatellar effusion.  (Tr. 388-89.)  Examination of the lumbar spine and right knee revealed tenderness and mild pain with range of motion.  (Tr. 391.)  His gait was normal.  (*Id*.)  Mental examination findings were normal.  (*Id*.)  Mr. Bibler's diagnoses included lumbar spondylosis, narrowing of lumbar intervertebral disc space, osteoarthritis of the right knee, and effusion of the right knee.  (Tr. 392-93.)  He was instructed to rest and use ice; he was referred to orthopedics.  (*Id*.)

On March 2, 2023, Mr. Bibler returned to CNP Akwanga, complaining of moderate-severe right knee pain that he rated 8/10, which he said made it difficult for him to walk.  (Tr. 395-401.)  He described the pain as sharp and aching and aggravated by movement and walking.  (Tr. 395.)  Associated symptoms included tenderness and limping.  (*Id*.)  He reported a moderate activity level, including walking daily for exercise, and reported that his hobbies included golfing and being outdoors.  (Tr. 397.)  On examination, Mr. Bibler limped and exhibited tenderness, mild swelling, and moderate pain with motion in the right knee; physical and mental findings were otherwise normal.  (Tr. 399.)  Mr. Bibler was diagnosed with chronic pain of the right knee, suprapatellar effusion of the knee, and primary osteoarthritis of the right knee.  (Tr. 400.)  CNP Akwanga ordered an MRI of the right lower extremity, provided an orthopedic referral, and advised Mr. Bibler to rest, apply ice and heat as needed, and take over-the-counter naproxen or ibuprofen as needed.  (*Id*.)

During an April 13, 2023 follow up visit with CNP Akwanga regarding hypertension and hyperlipidemia (Tr. 402-08), Mr. Bibler reported back and joint pain (Tr. 405).  He also continued to report that his activity level was moderate, noting he walked daily for exercise and

4

his hobbies included golf and being outdoors.  (Tr. 404.)  His examination findings were normal.  (Tr. 406-07.)  Instructions at the end of the visit included increasing his activity level to 30-60 minutes/day for three to five times per week.  (Tr. 407.)  X-rays of the lumbar spine and right knee taken on April 28, 2023, showed moderate spondylosis and moderate L2-3 and mild L5-S1 disc space narrowing in the lumbar spine, and mild osteoarthrosis in the right knee.  (Tr. 410-11.)

On October 27, 2023, Mr. Bibler presented to Bruce Bouts, M.D., at Blanchard Valley Medical Associates regarding his right knee pain, reporting he needed to have his knee replaced.  (Tr. 458.)  Mr. Bibler's musculoskeletal examination was normal, with no tenderness or peripheral edema in the lower extremities.  (Tr. 460.)  His gait was normal, he had the ability to stand without difficulty, and it was noted he was able to participate in an exercise program.  (*Id*.)  His mental status examination was also normal.  (*Id*.)

On November 14, 2023, Mr. Bibler presented to Kara Holcomb, CNP, at the Orthopaedic Institute of Ohio for evaluation and treatment of his right knee pain.  (T 451.)   He reported tearing his ACL when he was 17 years old and having problems ever since.  (*Id*.)  He described his pain as achy in nature, with swelling.  (*Id*.)  He was not interested in injections, and wanted to move forward with a knee replacement.  (*Id*.)  On examination, he was well-dressed, well-groomed, alert, and in no acute distress.  (*Id*.)  He had a painless, full range of motion through the hip and ankle with no instability.  (*Id*.)  He also demonstrated full range of motion in the knee, but with crepitance and discomfort.  (*Id*.)  Tenderness to palpation was noted over the medial and lateral joint line and mild effusion.  (*Id*.)  McMurray's test was negative.  (*Id*.)  Mr. Bibler ambulated with a nonantalgic gait.  (*Id*.)  His muscle tone and bulk were normal, and his deep tendon reflexes were intact and symmetric.  (*Id*.)  X-rays of the right knee taken that day showed: "advanced tricompartmental osteoarthrosis with bone-on-bone through the lateral and patellofemoral compartments. Surrounding periarticular osteophytes."  (*Id*.)  Mr. Bibler was

diagnosed with primary osteoarthritis of the right knee. (*Id*.) He was interested in knee replacement, not injections. (*Id*.) He was referred to Dr. Matthews for further discussion. (*Id*.)

On November 16, 2023, Mr. Bibler presented to Dylan Matthews, D.O., at the Orthopaedic Institute of Ohio. (Tr. 449.) Mr. Bibler reported tearing his ACL years prior without surgery, and said he had pain and instability ever since. (*Id*.) Examination of his right lower extremity revealed mild effusion, pain with McMurray's testing, and laxity with Lachman exam. (*Id*.) Motor and sensory examinations were intact without deficits. (*Id*.) Dr. Matthews reviewed the x-rays of the right knee, finding they showed: "moderate to severe osteoarthritis with joint space narrowing and subchondral sclerosis." (*Id*.) Mr. Bibler was diagnosed with primary osteoarthritis of the right knee. (*Id*.) Before proceeding with surgery, Dr. Matthews recommended at least one corticosteroid injection. (*Id*.) Dr. Matthews also provided Mr. Bibler with a hinged knee brace to provide stability for his knee. (*Id*.) Mr. Bibler tolerated the right knee injection well. (*Id*.) Dr. Matthews recommended follow up in three months. (*Id*.)

### 2. Opinion Evidence

#### i. State Agency Medical and Psychological Consultants

On December 6, 2021, state agency medical consultant physician Mehr Siddiqui, M.D., observed that Mr. Bibler was alleging disability due to bulging disc in spine, torn meniscus, arthritis, degenerative disc disease, and sciatica, but that attempts to reach Mr. Bibler or his representative had been unsuccessful. (Tr. 63.) No medical evidence was received (Tr. 62), and Dr. Siddiqui found no evidence of a medically determinable impairment (Tr. 63).

On August 6, 2023, nearly two years later, state agency medical consultant Meghana Karande, M.D., reviewed new medical evidence, including treatment records and x-rays from March and April 2023 and a consultative examination report from May 2023 (Tr. 76-77), and

concluded that Plaintiff had no severe impairments and no physical limitations (Tr. 77-78).  In so finding, Dr. Karande observed that the treatment records were "scant" with "no evidence of chronic knee and back pain," and noted that the only "detailed exam" was the consultative examination, for which the medical source statement "did not find severe limitations."  (Tr. 77.)

On August 8, 2023, state agency psychological consultant Jennifer Duffy, Ph.D., reviewed the records, including the June 2023 psychiatric consultative examination, and found Mr. Bibler's mental impairments were not severe, and that he had no more than mild limitations in: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself.  (Tr. 78-79.)  In so finding, Dr. Duffy noted Mr. Bibler's score of 28/30 on the mini mental status examination and found the consultative examiner's assessment of no to mild limitations appeared consistent with the totality of the medical records, the objective evidence, and Mr. Bibler's activities of daily living as documented during his consultative psychiatric examination.  (Tr. 79.)

### ii.    Consultative Psychiatric Examiner

On June 11, 2023, Mr. Bibler presented to David Earl, II, M.D., for a consultative psychiatric examination.  (Tr. 421-27.)  He reported a long history of depression with multiple suicide attempts via overdose.  (Tr. 422.)  He said he was married for twenty-eight years, until his wife overdosed in front of him.  (*Id*.)  He also reported a history of polysubstance abuse, including opioids and stimulants, but said he had been sober for just over one year.  (*Id*.)  He was homeless and the shelter he was staying at was helping him with his sobriety.  (*Id*.)  He did not have a treating psychiatrist or therapist.  (*Id*.)  He said he could not walk long distances, so he required some assistance with transportation.  (Tr. 424.)  Otherwise, he reported not needing assistance with activities of daily living.  (*Id*.)

On examination, Mr. Bibler was cooperative and pleasant with appropriate eye contact. (*Id*.) He had a mild speech impediment. (*Id*.) His mood was "ok" and his affect was congruent and neutral, and with a restricted range; he was tearful at times during the interview. (*Id*.) His thought process was linear, with no noted flight of ideas or loosening of associations. (*Id*.) He denied suicidal or homicidal ideation and denied passive thoughts of death. (*Id*.) There was no evidence of delusional ideation or perceptual disturbance, and his attention and concentration were adequate with no distractibility observed. (*Id*.) His memory was grossly intact, and his fund of knowledge was adequate for his age and level of education. (Tr. 425.) His insight and judgment were fair. (*Id*.) "Mini Mental State Exam" scoring suggested no neurocognitive impairment. (*Id*.) Physical examination findings were normal. (*Id*.)

Dr. Earl's diagnostic impression was probable major depressive disorder, unspecified anxiety, history of stimulant and opioid use disorders in remission, and probable PTSD. (*Id*.) Dr. Earl opined that Plaintiff had either "None" or "Mild" limitations in the areas of understanding and remembering, social interaction, concentration and task completion, and adaption. (Tr. 427.) Dr. Earl also stated that Mr. Bibler was "likely to have difficulty persisting at tasks and being a dependable employee given the degree of chronic pain, anxiety, and lack of consistent transportation," and "would likely require some supervision at any type of work-related activity given [his] history." (Tr. 426.)

### iii. Consultative Physical Examiner

On May 21, 2023, Mr. Bibler presented to Victor Salgado, M.D., for a consultative medical examination. (Tr. 413-20.) Mr. Bibler reported he could sit and/or stand for 20-30 minutes at a time and walk one block. (Tr. 413.) He could not estimate how much weight he could lift. (*Id*.) On examination, he was appropriately groomed and in no acute distress. (Tr.

8

414.) He was alert with appropriate eye contact, speech, and mood, and his memory and concentration were normal. (Tr. 415.) He walked with a slight antalgic gait without the use of an assistive device. (Tr. 414, 416.) He was able to walk on his heels and toes, tandem walk normally, and hop on his left foot; he did not hop on his right foot. (Tr. 416.) There was no clubbing, cyanosis, or edema in his extremities. (*Id*.) His muscle strength, tone, and bulk were normal. (Tr. 415-16.) Mr. Bibler reported absent sensation to light touch in the right fifth finger and the lateral right lower leg. (Tr. 416.) Mr. Bibler's sensation to light touch was otherwise normal and intact throughout. (*Id*.) There was tenderness to palpation in the lumbar spine. (Tr. 418.) Straight leg testing was negative bilaterally, but with knee crepitus and pain noted on bilateral straight leg testing. (Tr. 416, 417.) Crepitus in the right knee was moderate to severe, and crepitus in the left knee was mild. (Tr. 416.) Mr. Bibler demonstrated a normal range of motion, including in his shoulders and back, and his reflexes were normal. (Tr. 416-17.) He was able to lift, carry, and handle light objects. (Tr. 416.) He was able to squat and rise without difficulty. (*Id*.) Dr. Salgado diagnosed: bulging disc in the spine; degenerative disc disease; sciatica; and ligament and meniscal issues and arthritis in the right knee. (Tr. 418.) Dr. Salgado opined that Plaintiff had no physical limitations. (Tr. 418-19.)

## C. Hearing Testimony

### 1. Plaintiff's Testimony

Mr. Bibler testified in response to questioning by the ALJ and his counsel at the hearing on March 4, 2024. (Tr. 39-53.) He said he had been homeless for about three years. (Tr. 39, 40.) His driver's license was suspended due to fines and a driving under the influence conviction. (Tr. 40-41.) He last worked in 2019. (Tr. 42.) He said he stopped working due to his health conditions, but also said his "job[] closed down because of the pandemic." (*Id*.)

9

Mr. Bibler reported that the only prescription medication he took was blood pressure medication.  (Tr. 47.)  His doctors offered him pain medication, but he did not take pain medication other than Advil because it was not conducive to his sobriety.  (Tr. 47, 50-51.)  The last time he received mental health treatment was about six years earlier.  (Tr. 47-48.)  While he still had some mental health symptoms, he said he was not receiving mental health treatment because he was doing better, and because it was harder for him to get treatment.  (Tr. 48.)

Mr. Bibler did not feel he would be able to perform a job that required him to stand on his feet all day and lift 10 to 20 pounds now and then, explaining he had a bad back, shoulders, and neck, and a knee replacement.  (*Id*.)  He said it was "just hard for [him] to physically function." (*Id*.)  He estimated he could stand for about 10 to 15 minutes at one time before needing to take a break; he then needed to rest for 30 to 40 minutes before standing comfortably again.  (Tr. 49.) Some days, he could not walk and would be in bed all day because of problems with his back and knee.  (*Id*.)  He estimated he could lift only a pound because of his lower back pain.  (Tr. 49-50.)  He usually could not lift objects above his head due to problems with his shoulders and neck, and had arthritis throughout his body from doing flooring for 26 years.[2]  (*Id*.)  He was able to dress himself, but his girlfriend helped him if she was with him because it was painful for him. (Tr. 51.)  The hardest thing was putting on pants and socks because it required him to bend over. (*Id*.)  It was also hard for him raise his arms to put on or take off a shirt.  (Tr. 53.)  His girlfriend worked and did not live with him, but she was with him as much as she could be.  (Tr. 52.)  He said he could prepare something simple to eat, like a sandwich or bowl of cereal.  (*Id*.)

---

[2] He said his shoulders were "horrible" and he had talked to his doctors about it, but they told him to focus on one thing at a time and they were more concerned about his back and knee.  (Tr. 52-53.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 53-58.)  The VE classified Mr. Bibler's past relevant work as: tile setter, a medium SVP 7 job; carpet layer, a heavy SVP 7 job; general inspector, a light SVP 4 job, performed by Mr. Bibler at the medium level; and conveyor off bearer, a medium SVP 2 job, performed by Mr. Bibler at the light level.  (Tr. 54.)

The VE testified that a hypothetical individual of Mr. Bibler's age, education, and work experience, and with the functional limitations described in the ALJ's RFC determination (Tr. 22), could perform representative light positions in the national economy such as: small products assembler, office helper, and cashier II.  (Tr. 54-56.)  If the hypothetical individual required frequent, unscheduled breaks (at least one or two extra 15- or 20-minute breaks in the morning and afternoon) and would have difficulty maintaining regular attendance such as being absent at least four times per month, the VE testified that there would be no jobs available.  (Tr. 56-57.)  The VE also testified there would be no transferable skills at a sedentary RFC.  (Tr. 57-58.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; § 416.920[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

## IV.    The ALJ's Decision

In her June 14, 2024 decision, the ALJ made the following findings:[4]

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.  (Tr. 19.)

2.    The claimant has not engaged in substantial gainful activity since May 31, 2021, the alleged onset date.  (*Id*.)

3.    The claimant had the following severe impairments: lumbar degenerative disc disease with stenosis, right knee degenerative joint disease / osteoarthritis, hypertension, and chronic hepatitis C.  (Tr. 19-20.)  The impairments of major depressive disorder, anxiety disorder, and post-traumatic stress disorder are not severe.  (Tr. 20-21.)  The impairments of peripheral polyneuropathy, restless leg syndrome, and history of mild degenerative joint disease of the left hip are not severe.  (Tr. 21.)  The alleged impairments of carpal tunnel syndrome and left ventricular hypertrophy are not medically determinable impairments.  (*Id*.)  The alleged symptoms of bilateral shoulder pain, blurred vision, shortness of breath, and neck pain do not correspond to any medically determinable impairment established in the record.  (*Id*.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 22.)

5.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) in that he can lift/carry 20 pounds occasionally, lift/carry 10 pounds frequently, stand or walk for 4 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday; he can occasionally climb ramps or stairs; he can never climb ladders, ropes, or scaffolds; and he can frequently stoop, kneel, crouch, and crawl.  (Tr. 22-25.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 25.)

7.    The claimant was born in 1971 and was 50 years old, which is defined as an individual closely approaching advanced age, on the amended disability onset date.  (*Id*.)

8.    The claimant has at least a high school education.  (Tr. 26.)

9.    The claimant has no transferable job skills.  (*Id*.)

---

[4] The ALJ's findings are summarized.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including small product assembler, office helper, cashier II.  (Tr. 26-27.)

Based on the foregoing, the ALJ found Mr. Bibler was not under a disability from May 31, 2021, through the date of the decision.  (Tr. 18, 27.)

## V.    Plaintiff's Arguments

Mr. Bibler presents two arguments on appeal.  (ECF Doc. 8, pp. 3, 10-19; ECF Doc. 11.) First, he argues the ALJ's physical RFC lacks the support of substantial evidence because the ALJ formulated the RFC "without a useful medical opinion."  (ECF Doc. 8, pp. 10-16; ECF 11, pp. 1-4.)  Second, he argues the "ALJ failed to reconcile the opinion of psychiatric consultative examiner Dr. Earl with the RFC determination."  (ECF Doc. 8, pp. 16-18; ECF Doc. 11, pp. 4-5.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

14

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: The Physical RFC is Supported by Substantial Evidence**

In his first assignment of error, Mr. Bibler argues that the ALJ's physical RFC lacks the

support of substantial evidence because "the ALJ devised this very significant and detailed

physical RFC without a useful medical opinion." (ECF Doc. 8, p. 11.)  In so arguing, he

acknowledges that there are three medical opinions in the record—two from state agency

medical consultants and one from a consultative medical examiner—none of which found he had

functional limitations resulting from his physical impairments. (*Id.*)  He also acknowledges that

the ALJ properly discounted all three opinions, finding the evidence supported some degree of

limitations due to his physical impairments. (*Id.* (citing Tr. 25).)  Nevertheless, Mr. Bibler

contends that the ALJ's physical RFC lacked the support of substantial evidence because "the

ALJ had no useful guidance in determining the RFC" given the "unsupported medical opinions,"

and asserts that the ALJ had a duty to further develop the record by obtaining additional medical

opinion guidance before adopting a physical RFC. (*Id.* at pp. 11-16; ECF Doc. 11, pp. 1-4.)

In response, the Commissioner argues that the ALJ reasonably considered the evidence of

record when assessing Mr. Bibler's physical RFC and adopted an RFC supported by substantial

evidence, and further asserts that the ALJ was not required to further develop the record or to

adopt an RFC that mirrored any specific medical opinion. (ECF Doc. 10, pp. 6-15.)

There are three medical opinions of record relating to Mr. Bibler's physical impairments.

The first are two state agency medical consultant opinions.  On initial review, Dr. Siddiqui found

no evidence of a medically determinable impairment. (Tr. 63.)  On reconsideration, Dr. Karande

found Mr. Bibler's knee osteoarthritis and lumbar spine degenerative disease "non-severe alone

and in combination." (Tr. 77-78.)  The ALJ found these opinions to be unpersuasive, explaining:

> State agency consultant, Mehr Siddiqui M.D., submitted an assessment in
> December 2021, and found insufficient evidence of a medically determinable

16

physical impairment (Exhibits 3A, 4A). State agency consultant, Meghana Karande M.D., submitted an assessment in August 2023, and noted nonsevere impairments of lumbar spinal stenosis and osteoarthrosis (Exhibits 7A, 8A). <u>I find these assessments unpersuasive, as the evidence supports the presence of severe physical impairments, and notes that these doctors did not provide an opinion regarding the claimant's residual functional capacity.</u>

(Tr. 25 (emphasis added).) The third medical opinion is Dr. Salgado's consultative opinion, finding Mr. Bibler "did not have physical abnormalities to limit sitting, standing, walking, lifting, carrying, bending, squatting, reaching, handling, feeling, grasping, vision or communication."

(Tr. 418.)   The ALJ found this opinion partially persuasive, explaining:

> The claimant underwent a physical consultative examination in May 2023 and was diagnosed with degenerative disc disease of the spine with sciatica and ligament and meniscal issues, and arthritis of the right knee (Exhibit 3F/6). On exam he displayed a slight antalgic gait due to knee and back pain, without the use of an assistive device, and was in no acute distress (Exhibit 3F/2). The claimant had full muscle strength of the upper and lower extremities and no muscle spasms (Exhibit 3F/3). He reported abnormal sensation to light touch of the lateral right lower leg, but his sensation to light touch was otherwise normal and intact throughout. The claimant demonstrated moderate to severe right knee crepitus and no knee joint laxity. He displayed normal reflexes, full range of motion of the back, lumbar tenderness to palpation, and negative straight leg test bilaterally. The claimant was able to lift, carry and handle light objects, was able to squat and rise from that position without difficulty, and was able to walk on heels and toes. Tandem walking was normal, and claimant could hop on one foot bilaterally (Exhibit 3F/4-6). <u>The consultative examiner opined that the claimant had no physical abnormalities to limit his sitting, standing, walking, lifting, carrying, bending, squatting, reaching, handling, feeling, grasping, vision or communication</u> (Exhibit 3F/6-7). <u>I have considered these findings but find this opinion only partially persuasive because the evidence of records supports some degree of limitations due to the claimant's physical impairments, as reflected in the residual functional capacity.  However, the opinion is persuasive as to the lack of limitations in reaching, handling, feeling, grasping, vision, or communication.</u>

(Tr. 24-25 (emphasis added).)

After considering Mr. Bibler's subjective complaints, the medical records, and all of the medical opinion evidence (Tr. 23-25), the ALJ concluded that Mr. Bibler had the RFC to perform light work as follows: lift/carry 20 pounds occasionally; lift/carry 10 pounds frequently;

stand or walk 4 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally

climb ramps or stairs; never climb ladders, ropes, or scaffolds; and frequently stoop, kneel,

crouch, and crawl.  (Tr. 22.)  After discussing the relevant evidence, she explained:

> In summary, I find the objective findings are consistent with, and support a
> limitation to, light exertional activities. The claimant's back and right knee pain,
> and possible high blood pressure or hepatitis C symptoms, limit him to lifting up to
> 20 pounds, limit him to standing/walking for 4 hours in an 8-hour workday and
> prevent him from climbing ladders, ropes or scaffolds. The claimant can frequently
> stoop, kneel, crouch and crawl, and can occasionally climb ramps/stairs to avoid
> exacerbating pain or high blood pressure.

(Tr. 25.)

Mr. Bibler argues that this RFC lacked the support of substantial evidence because the

three relevant medical opinions were "unsupported" and left the ALJ with "no useful guidance in

determining the RFC."  (ECF Doc. 8, p. 11.)  In such situations, he asserts the ALJ had a duty to

further develop the record by obtaining additional opinion evidence to interpret the "raw medical

data" and account for "a critical body" of new medical evidence.  (*Id.* at p. 14.)

### 1.    The ALJ Did Not Have a Heightened Duty to Develop the Record

At the hearing level, after the denial of benefits on initial review and reconsideration, the

Sixth Circuit explains that an ALJ must act "as an examiner charged with developing the facts"

and ensure that every claimant receives a full and fair hearing.  *Lashley v. Sec. of Health &

Human Services*, 708 F.2d 1048, 1051 (6th Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S.

389, 411 (1971)).  Nevertheless, "while the ALJ must ensure that every claimant receives 'a full

and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant."

*Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (quoting *Duncan v. Sec'y of

Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); citing 20 C.F.R. § 404.1512(a)), *cert.

denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); *see also Wilson v. Comm'r of Soc.

Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); 20 C.F.R. § 416.912(a)(1) ("[Y]ou have to prove to

us that you are blind or disabled."); 20 C.F.R. § 416.945(a)(3) ("[Y]ou are responsible for providing the evidence we will use to make a finding about your residual functional capacity.").

In special circumstances, the Sixth Circuit has held that an ALJ must "exercise a heightened level of care" in developing the record.  *Lashley*, 708 F.2d at 1051-52.  Heightened care is required for unrepresented claimants who are unfamiliar with hearing procedures and incapable of presenting an effective case.  *See Wilson*, 280 F. App'x at 459 (citing *Lashley*, 708 F.2d at 1051-1052); *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (citing *Duncan*, 801 F.2d at 856).  In contrast, heightened care is not required for unrepresented claimants who demonstrate a grasp of the proceedings and adequately present their cases, *see Moats*, 42 F.4th at 564; *Wilson*, 280 F. App'x at 459, or claimants who are represented by counsel at the hearing level, *see Stevenson v. Kijakazi,* No. 5:20CV2688, 2022 WL 4551590, at *13 (N.D. Ohio Sept. 29, 2022).

Here, Mr. Bibler was represented throughout the administrative proceedings, including at his March 2024 hearing.  (Tr. 34, 37, 93-96, 200, 202-05, 286-89.)  Thus, the ALJ did not have a heightened duty of care to develop the record in this case.

### 2.    The ALJ Did Not Fail in Her Duty to Develop the Record

Without specifically arguing for a heightened duty of care, Mr. Bibler asserts that the ALJ nevertheless failed in her duty to develop the record because she adopted an RFC without any "useful medical opinion[s]" in evidence to provide her "useful guidance in determining the RFC."  (ECF Doc. 8, p. 11.)  Without additional medical opinion evidence, Mr. Bibler asserts that the ALJ improperly "interpret[ed] raw medical data" and lacked the opinion evidence necessary to address "a critical body of the objective medical evidence."  (*Id.* at p. 13.)  The Commissioner challenges Mr. Bibler's characterization of the three opinions as not "useful," arguing "simply because Plaintiff does not like or agree with the medical opinion in the record

does not make them useless." (ECF Doc. 10, p. 10.)  The Commissioner also notes that it is within the ALJ's discretion to determine whether additional evidence is necessary, and that the ALJ alone is responsible for determining a plaintiff's RFC. (*Id.* at p. 7.)  Because the ALJ appropriately considered available evidence while exercising that discretion, the Commissioner asserts that her RFC determination was supported by substantial evidence. (*Id.* at pp. 7-10.)

As an initial matter, it is noted that Mr. Bibler has not identified evidence indicating the ALJ failed to provide any requested assistance in developing the record.  Mr. Bibler's representative submitted a pre-hearing brief (Tr. 355-57) and requested time to submit additional records after the hearing (Tr. 358-59).  At the hearing, he noted that he was still waiting on certain records, but said he could not "imagine there [wa]s anything so pressing in [the records] that would change the crux of [his] argument." (Tr. 38.)  The ALJ nevertheless agreed to leave the record open for 21 days, noting that Plaintiff could request additional time. (*Id.*)  Mr. Bibler made three subsequent requests for additional time, in March and April 2024. (Tr. 368-70.)  The ALJ did not issue her decision until June 14, 2024. (Tr. 14.)  Thus, the ALJ accommodated Mr. Bibler's efforts to submit appropriate medical records.  Certainly, Mr. Bibler has not suggested that the ALJ denied requests for additional time to submit records, or denied requests for assistance in obtaining additional medical opinions.  Given that Mr. Bibler was represented and bore "the ultimate burden of proving entitlement to benefits," *Moats*, 42 F.4th at 563, his representative's failure to mention a need for additional medical opinions when discussing other outstanding records with the ALJ, and his additional failure to ask the ALJ to obtain or assist with obtaining such medical opinion evidence, undermines his after-the-fact argument that the ALJ committed error when she did not independently obtain such evidence.

20

Turning to Mr. Bibler's argument that the ALJ had a duty to obtain additional medical opinion evidence because the three opinions in evidence were not "useful" and predated "a critical body of evidence," this argument is inconsistent with Sixth Circuit precedent.  The Sixth Circuit does not require an ALJ to "get the opinion of another physician before setting the [RFC]."  *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).  The court has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *Id.* at 401-02 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) *and Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)); *see also Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19 CV 2844, 2020 WL 7769729, at *10-11 (N.D. Ohio Dec. 30, 2020) (finding *Mokbel-Aljahmi* to be "contrary" to an argument that "the lack of any medical opinion evidence for . . . physical impairments, apart from two outdated opinions from non-examining physicians, denotes a lack of substantial evidence supporting the RFC").

As to the argument that the ALJ was required to obtain additional opinion evidence in order to avoid interpreting "raw medical data," the Sixth Circuit has also explained that an ALJ is "not required to obtain a medical expert to interpret the medical evidence related to his physical impairments."  *Rudd*, 531 F. App'x at 726.  "In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled."  *Id.*  Further, the Sixth Circuit has clarified that it is within an ALJ's ability to interpret medical data from an x-ray where the relevant raw data has already been "read and interpreted by a radiologist."  *Id.* at 726-27; *see also Kleinhans v. Kijakazi*, No. 3:23-CV-00173, 2023 WL 7923901, at *8 (N.D. Ohio Sept. 28, 2023) ("[A]n ALJ does not interpret 'raw medical data' where it has already been 'read and interpreted' by a medical professional.") (citing *Rudd*, 531 F. App'x at 727).

21

In this case, Mr. Bibler argues that the medical evidence is "too complex for the ALJ to use her lay opinion to determine physical limitations."  (ECF Doc. 8, p. 15.)  But the objective evidence he highlights is limited to simple physical examination findings (like tenderness, pain with range of motion, and limping) and x-ray findings that were read and interpreted by medical professionals.  (*See id.* at pp. 15-16.)  Further, many of the records he describes as "too complex" for the ALJ (*id.*) were before state agency medical consultant Dr. Karande when she opined that his physical impairments were "non-severe alone and in combination" (Tr. 84-86).  Dr. Karande was aware of Mr. Bibler's report that he had severe arthritis that was bone on bone, and that he was told he would need a knee replacement, but also considered the "scant" treatment records and the consultative examiner's finding of no limitations after a detailed physical examination. (Tr. 85.)  In these circumstances, governing Sixth Circuit precedent does not support a finding that the ALJ erred when she failed to independently obtain additional medical opinion evidence.

The cases cited by Mr. Bibler as establishing a duty to develop the record do not change this analysis, as the cases rely on a standard set forth in two non-binding district court decisions that other district courts have found to be inconsistent with Sixth Circuit precedent.  The cases setting the standard generally held that an ALJ should obtain an additional medical opinion when the only medical opinion in evidence is an "outdated" opinion from a non-examining source.  *See Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008); *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011).  But many courts in this district have appropriately declined to follow the *Deskin/ Kizys* standard.  *See, e.g., Carr v. Comm'r of Soc. Sec.*, No. 5:23-CV-00187, 2024 WL 1343473, at *5 (N.D. Ohio Mar. 30, 2024) (collecting cases).  As one court explained:

> *Deskin* is a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law . . . By requiring an ALJ to secure a medical opinion

whenever the record does not contain such an opinion, subject to only limited exceptions, *Deskin* places a higher burden on the ALJ than the Sixth Circuit does.

*Winans v. Comm'r of Soc. Sec.*, No. 5:22-CV-01793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023). Instead, courts have held that "[a]n ALJ need not 'obtain[] updated opinion evidence, so long as the ALJ's ultimate decision is supported by substantial evidence." *Davidson v. Comm'r of Soc. Sec.*, No. 3:22 CV 938, 2023 WL 5948122, at *4 (N.D. Ohio Sept. 13, 2023).

Mr. Bibler's reliance on the *Deskin/ Kizys* standard is not persuasive because the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi*, 732 F. App'x at 401. Mr. Bibler's assertion that the ALJ was required to obtain new opinion evidence despite three medical opinions in evidence, including one from an examining source, would place a higher burden on the ALJ than the governing regulations or Sixth Circuit precedent. This argument for an expanded duty to develop the record lacks merit.

It also warrants mention that the result would be the same in this case even if the Court applied the *Deskin/ Kizys* standard. First, *Deskin* called for additional medical opinion evidence only where there was "no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion)." *Deskin*, 605 F. Supp. 2d at 912. Here, consultative examiner Dr. Salgado conducted a detailed physical examination before opining that Mr. Bibler "did not have physical abnormalities to limit sitting, standing, walking, lifting, carrying, bending, squatting, reaching, handling, feeling, grasping, vision or communication." (Tr. 418.) Second, *Kizys* narrowed the standard to cases where there is a "critical body of objective evidence" not accounted for by a medical opinion. *Kizys*, 2011 WL 5024866 at *2. Here, it appears that the only evidence not before Dr. Karande when she found Mr. Bibler's physical impairments non-severe were treatment records from October and November 2023, which the ALJ summarized:

23

The claimant was examined in October 2023, and displayed no lower extremity tenderness or edema, he had a normal gait, and he was able to stand without difficulty [].

The claimant was evaluated by an orthopedic specialist in November 2023 and displayed right knee tenderness, mild effusion of the right lower extremity with some laxity felt, full range of motion of the right knee with some crepitance and discomfort with range of motion, intact motor functioning and sensation, normal reflexes and a non-antalgic gait []. An x-ray of the right knee showed advanced tricompartmental osteoarthrosis with bone-on-bone through the lateral and patellofemoral compartments, surrounding periarticular osteophytes []. The claimant received a corticosteroid injection to the right knee []; however, the record reflects no additional treatment such as physical therapy, additional injections or surgical intervention to the right knee. While the claimant has chosen to use a cane to assist with ambulation, there is no evidence to document that his use of such is medically necessary.

(Tr. 24 (citations omitted).)  Although Dr. Karande did not consider these treatment records, she did consider reports that Mr. Bibler's knee was "bone on bone," that he was told he would need a knee replacement, exams showing crepitus and an antalgic gait, and March 2023 x-rays showing mild osteoarthritis.  (Tr. 84-85.)  She also noted the "scant" treatment records and the fact that the only detailed physical examination in evidence was from the consultative examiner, whose medical source statement "did not find severe limitations."  (Tr. 85)  It is thus evident that the medical opinions of record did not fail to account for a critical body of objective evidence.

More importantly, under the governing standards in the Sixth Circuit, the ALJ considered the evidence post-dating the medical opinions and accounted for it in her RFC.  Although the medical sources found Mr. Bibler had no limitations resulting from his physical impairments, the ALJ found instead that he was limited to performing light work with reduced standing and walking and additional climbing and postural limitations.  (Tr. 22-25.)  The Sixth Circuit explained in *Blakley* that there must be "some indication that the ALJ at least considered" medical evidence that post-dates a non-examining source opinion, but did not find that such consideration must be supported by a new medical opinion.  581 F.3d at 409 (quoting *Fisk v.*

24

*Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).  District courts have accordingly concluded that "[a]n ALJ need not 'obtain[] updated opinion evidence, so long as the ALJ's ultimate decision is supported by substantial evidence."  *Davidson*, 2023 WL 5948122, at *4 (quoting *Van Pelt*, 2020 WL 7769729, at *12  (citing *McGrew v. Comm'r of Soc. Sec*, 343 F. App'x 26, 32 (6th Cir. 2009)).  Here, the record shows that the ALJ appropriately considered the evidence post-dating the medical opinions, in combination with other evidence of record, and ultimately adopted a physical RFC that was supported by substantial evidence.

For the reasons set forth above, the undersigned finds Mr. Bibler has failed to show that the ALJ erred with respect to her duty to develop the record, or that she otherwise adopted a physical RFC that lacked the support of substantial evidence.  Accordingly, the undersigned finds Mr. Bibler's first assignment of error is without merit.

**C.     Second Assignment of Error: The ALJ Adequately Considered the Opinion of the Psychiatric Consultative Examiner When Assessing Plaintiff's Mental RFC**

In his second assignment of error, Mr. Bibler argues the "ALJ failed to reconcile the opinion of psychiatric consultative examiner Dr. Earl with the RFC determination."  (ECF Doc. 8, pp. 16-18; ECF Doc. 11, pp. 4-5.)  While the ALJ found the opinion "persuasive" as to Dr. Earl's finding of no to mild limitations in mental functioning (ECF Doc. 8, p. 18 (citing Tr. 20)), she did not address Dr. Earl's additional statements that Mr. Bibler was "likely to have difficulty persisting at tasks and being a dependable employee given the degree of chronic pain, anxiety, and lack of consistent transportation" and "would likely require some supervision at any type of work-related activity given their history" (*id.* (citing Tr. 426)).  Because the ALJ adopted an RFC with "no mental limitations, let alone limitations regarding persisting or staying on tasks, absences, or any supervision requirements," Mr. Bibler asserts that SSR 96-8p required her to explain why she did not adopt limitations consistent with Dr. Earl's opinion.  (*Id*. at pp. 17-18.)

The Commissioner responds that substantial evidence supported the ALJ's conclusion that Dr. Earl's findings of no or mild limitations in mental functioning were persuasive as they were supported by the objective examination findings and consistent with the other evidence of record, including a lack of formal mental health treatment and normal mental status examinations during primary care office visits.  (ECF Doc. 10, p. 12 (citing Tr. 20).)  As to Dr. Earl's statements regarding Mr. Bibler's ability to persist at tasks and his need for supervision, the Commissioner asserts that the ALJ was not required to address the statements because they were "not medical opinions" but "vague statements that lack any specific limitations."  (*Id.* at p. 13.)

A "medical opinion" is defined as "a statement from a medical source about what [a plaintiff] can still do despite [his] impairment(s) and whether [he] ha[s] one or more impairment-related limitations or restrictions" in abilities like "perform[ing] mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." 20 C.F.R. § 404.1513(a)(2)(ii).   In applying this definition, courts have recognized that the "vagueness of a medical opinion is a proper basis on which to afford it less weight." *See, e.g., Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 747 (N.D. Ohio 2020) (citing *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008)).

Here, Dr. Earl's report clearly offers medical opinions as to Mr. Bibler's impairment-related limitations in the four areas of mental functioning, rating the "[d]ifficulty" of functioning as "Mild" or "None" in each of several specified areas.  (Tr. 427.)  As to both "[a]bility to persist at tasks" and "[a]bility to work without supervision" in particular, Dr. Earl rated Mr. Bibler's difficulty level as "Mild."  (*Id.*)  Dr. Earl also offered additional comments regarding Mr. Bibler's prognosis and recommended therapies, and observed:

> Additionally, the claimant is likely to have difficulty persisting at tasks and being a dependable employee given the degree of chronic pain, anxiety, and lack of consistent transportation. The claimant would likely require some supervision at any type of work-related activity given their history.

(Tr. 426.) The Commissioner argues that the ALJ was not required to address these statements because they are not "opinions" but rather "vague statements that lack any specific limitations." (ECF Doc. 10, p. 13.) Regardless of whether the language is vague, Mr. Bibler asserts that "one cannot argue that Dr. Earl's opinion does not reflect *some* limitation." (ECF Doc. 11, p. 4.)

Considering the specific language used by Dr. Earl, in particular his findings that Plaintiff was "likely to have difficulty persisting at tasks and being a dependable employee" and likely to "require some supervision," the undersigned assumes without deciding that the described limitations relate to the performance of the mental demands of work and amount to "medical opinions."[5] Assuming that to be true, the question becomes whether the ALJ erred by failing to incorporate related functional limitations into the RFC or by failing to specifically account for how she considered the opinions when deciding not to adopt mental RFC limitations.

First, it must be acknowledged that an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). Even where an opinion was given great weight under prior regulations, "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Nevertheless, Social Security Ruling 96-8p requires the ALJ to consider all

---

[5] It should be noted that there is some question whether the limitations are wholly "impairment-related limitations or restrictions" as contemplated by 20 C.F.R. § 404.1513(a)(2), given Dr. Earl's statement that Mr. Bibler's difficulty persisting at tasks would stem from "chronic pain, anxiety, *and lack of consistent transportation*" and that supervision was required "given [Plaintiff's] history," (Tr. 426 (emphasis added)). Because the undersigned ultimately finds no error in the ALJ's analysis, this issue need not be addressed further or resolved herein.

medical opinions in her RFC assessment and, where her assessment "conflicts with an opinion from a medical source," she "must explain why the opinion was not adopted." SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).

There is no dispute that the ALJ's written decision does not discuss Dr. Earl's statements regarding difficulty persisting at tasks or the need for supervision, and does not adopt any mental RFC limitations. Mr. Bibler asserts that this was error because "one cannot argue that Dr. Earl's opinion does not reflect *some* limitation" and the ALJ's decision does not explain how the RFC accommodates the relevant limitations as required by SSR 96-8p. (ECF Doc. 11, pp. 4-5 (emphasis in original).) But the Commissioner asserts that Dr. Earl's comments are merely "vague statements that lack any specific limitations." (ECF Doc. 10, p. 13.)

Considering the language used in Dr. Earl's opinion, the undersigned agrees that there is no specific articulation of the nature or degree of limitation that Dr. Earl anticipates would result from Mr. Bibler's "difficulty persisting at tasks and being a dependable employee." (Tr. 426.) But considering that Dr. Earl rated his difficulty in the "[a]bility to persist at tasks" as "Mild" on the very next page of his report (Tr. 427), it would be internally consistent to conclude that the degree of limitation contemplated in the earlier vague comment was also "mild." Likewise, there is no specific articulation of what amount of supervision Mr. Bibler would "likely require," including whether "some supervision" amounts to a greater level of supervision than that applied to other unskilled workers as a matter of course. (Tr. 426.) But given Dr. Earl's finding on the next page that Mr. Bibler's difficulty in "work[ing] without supervision" was "Mild" (Tr. 427), it would again be internally consistent to conclude that a requirement for "some supervision" does not amount to a requirement for additional or atypical levels of supervision. Ultimately, given

28

the vagueness of the opinion language and Dr. Earl's other findings clearly characterizing Mr. Biblers' limitations in mental functioning as "None" or "Mild," the undersigned finds that there is no clear conflict between Dr. Earl's opinion findings and the ALJ's conclusion that Mr. Bibler had "no more than 'mild' limitation in any of the [mental] functional areas" (Tr. 21) and adoption of an RFC with no mental limitations (Tr. 22).  And since the ALJ's RFC assessment did not conflict with Dr. Earl's medical opinion findings, the ALJ had no obligation to "explain why the opinion was not adopted" under SSR 96–8p.  61 Fed. Reg. at 34478.  Mr. Bibler has thus failed to show that the ALJ erred by failing to reconcile Dr. Earl's opinion with the RFC.

It is also evident from a review of the decision that the ALJ's evaluation of Dr. Earl's opinion and adoption of an RFC without mental limitations was supported by substantial evidence.  The ALJ considered Mr. Bibler's mental impairments but found they were not severe. (Tr. 20.)  In reaching this conclusion, she considered evidence revealing no formal mental health treatment during the relevant period and primary care examination findings showing Mr. Bibler to be fully oriented, with an appropriate mood and affect, normal insight and judgment, and normal memory.  (*Id*.)  The ALJ also considered Dr. Earl's opinion, explaining:

> The claimant underwent a psychological consultative examination in June 2023 and was diagnosed with major depressive disorder, probable posttraumatic stress disorder (PTSD), unspecified anxiety disorder and history of stimulant and opioid use disorder in remission (Exhibit 4F/5). On mental status exam, the claimant was cooperative and pleasant, and displayed appropriate eye contact, normal speech and a linear thought process without evidence of a neurocognitive disorder. He demonstrated adequate attention and concentration, grossly intact recent and remote memory, an adequate fund of knowledge, and fair judgment and insight (Exhibit 4F/3-5). The consultative examiner opined that the claimant had mild to no limitations in areas of mental functioning (Exhibit 4F/7). I find this opinion persuasive as it is supported by the objective exam findings, and is consistent with the other evidence of record.

(*Id*. (emphasis added).)  The ALJ also considered the opinions of the state agency psychological consultant, who found no severe mental impairments and no more than mild limitations in

mental functioning.  (*Id*.)  The ALJ also provided further detail and rationale for finding Mr. Bibler had no more than mild limitations in each of the areas of mental functioning, with specific citations to the medical records and Dr. Earl's examination findings.  (Tr. 20-21.)  Mr. Bibler has thus failed to show that the ALJ lacked substantial evidence to support her analysis of Dr. Earl's opinion and adoption of an RFC with no mental limitations.

For the reasons set forth above, the undersigned finds the ALJ adequately articulated her analysis of Dr. Earl's opinion, did not fail to explain why a conflicting opinion was not adopted under SSR 96–8p, and did not err in adopting an RFC with no mental limitations.  Accordingly, the undersigned concludes that Plaintiff's second assignment of error lacks merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

September 17, 2025

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).